| | | |
|---|---|---|
| JOSE ATANACIO RAMIREZ, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | NO. 3:26-cv-00888 |
| | ) | |
| CHRISTOPHER BULLOCK, *Field Office Director, New Orleans Field Office, U.S. Immigration and Customs Enforcement, in his official capacity*, et al., | ) ) ) ) | JUDGE RICHARDSON |
| | ) | |
| Respondents. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is the "Corrected Emergency Motion for a Temporary Restraining Order and Preliminary Injunction,"[1] which was made "pursuant to Rule 65(b)[2] of the

---

[1] The Motion's title suggests that Petitioner is seeking both a temporary restraining order ("TRO") and a preliminary injunction via the Motion. However, the Court discerns that Petitioner, via his Motion, in substance instead is requesting that the Court issue a TRO now and that the requested TRO (if granted) later be converted to a preliminary injunction.

[2] Although Petitioner asserts that the Motion is made pursuant to *Rule 65(b)*—which expressly relates specifically and exclusively to TROs issued *without* notice—the Court discerns that the Motion in reality is made pursuant to Rule 65 *as a whole*, which encompasses TROs issued with notice as well as TROs issued without notice. That is, the Court finds that the Motion amounts to a request for a TRO to be issued with notice, given that (1) Petitioner's Counsel has certified that he has "caused a copy of [the Motion] to be served, via electronic mail" on Respondents' counsel (Doc. No. 6 at 11), (2) Petitioner's counsel— according to his sworn Declaration (Doc. No. 6-6)—has "conferred with Assistant U.S. Attorney Mercedes Maynor and ERO Nashville leadership" (*id.* at 4), and (3) counsel for Respondents has appeared in this action (Doc. No. 8).

As suggested above, to the extent that Rule 65 as a whole (as opposed to Rule 65(b) in particular) addresses TROs (as opposed to preliminary injunctions), it does not contemplate *only* TROs being issued without written notice. Indeed, Rule 65(c) refers to TROs, *without* limiting the reference to TROs issued without notice. And nowhere does Rule 65 say either that the only kind of cognizable TRO is a TRO issued without notice to the adverse party, or that a motion is not cognizable as one for a "TRO"—even if it requests *immediate* temporary injunctive relief—unless it requests a TRO to be without such notice. Moreover, Rule 65(b)(1)'s plain purpose is simply to prescribe rules specifically for *when* there is no notice, and Rule 65(b)(1) thus has nothing to say about whether an order issued *with* notice properly can be

Federal Rules of Civil Procedure, Middle District of Tennessee Local Rule 65.01, and Administrative Order No. 17" (Doc. No. 6, "Motion"), filed by Petitioner, Jose Luis Atanacio Ramirez. The Motion is supported by a proposed order (Doc. No. 6-1, "Proposed Order"), the Sworn Declaration of Aaron Dendy, Esq. (Doc. No. 6-6, "Declaration"), various exhibits (Doc. Nos. 6-2 – 6-5 and 6-7, collectively the "Exhibits"), and a notice of supplemental authority (Doc. No. 11, "Notice of Supplemental Authority") accompanied by two exhibits thereto (Doc. Nos. 11-1 – 11-2).

For the reasons described below, the Motion (Doc. No. 6) is **DENIED**.

---

considered a TRO rather than, say, a preliminary injunction. Furthermore, the other subsections of Rule 65(b) have the same purpose and likewise have nothing to say about whether an order issued *with* notice properly can be considered a TRO. For example, Rule 65(b)(2) provides that "[e]very temporary restraining order issued without notice must state the date and hour it was issued . . . [and] expires at the time after entry—not to exceed 14 days." Rule 65(b)(3) provides that "[i]f the order is issued without notice, the motion for a preliminary injunction must be set for hearing at the earliest possible time." And Rule 65(b)(4) provides that "[o]n 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order." Each of these subsections leaves open the possibility that an order can properly be a TRO even if it is issued *with* notice. And each plainly implies that there is such a thing as a TRO issued *with* notice; after all, if there were no such thing—i.e., if an order cannot be a TRO if it is issued *with* notice—why would these subsections make plain that they are applicable only when a TRO is issued *without* notice?

All of this (as well as experience) tells the undersigned that there is such a thing as a TRO that is issued with notice; this is commonly understood by courts. *E.g., In re Reynolds*, No. 23-22086, 2023 WL 11853230, at *3 (Bankr. W.D. Tenn. Sept. 1, 2023) ("A temporary restraining order is a temporary order entered in an action, often without notice . . . ." (emphasis added)). In other words, a request can properly be deemed a request for a TRO even if it is issued with notice.

These observations do raise one (important) question, however. As observed, TROs issued with notice are not within the scope of Rule 65(b)'s provisions governing how long a TRO remains in effect, and *only* Rule 65(b) says anything about how long a TRO can remain in effect (14 days before (1) expiring completely; (2) being extended for good cause or by the consent of the party subject to the TRO; or (3) being converted into a preliminary injunction). So, how long can a TRO issued *with* notice remain in effect? At least for the purposes of this Motion, the Court will borrow, in its discretion, the 14-day maximum duration provided in Rule 65(b)(2) and the other provisions in Rule 65(b) governing the duration for no-notice TROs and apply it to TROs issued with notice (like that requested by Petitioner via the Motion). Notably, this 14-day maximum duration is the same duration of time that Petitioner has provided for his requested TRO (via the Proposed Order) to be enforceable. (Doc. No. 6-1 at 5). In other words, Petitioner's requested TRO, if it were granted, would be in effect, unless extended for good cause or by the consent of the party subject to the TRO or otherwise transformed into a preliminary injunction, for a maximum of 14 days.

<u>BACKGROUND</u>[3]

1.    <u>Factual Background</u>

On June 29, 2026, Enforcement and Removal Operations ("ERO")[4] Nashville officials detained Petitioner at a scheduled court appearance in Robertson County, Tennessee. (Doc. No. 6-6 at ¶ 5). At 3:56 PM that same day, counsel for Petitioner submitted an urgent administrative custody redetermination request to ERO Nashville leadership, citing Petitioner's 11-year continuous residence in Middle Tennessee, his active business ownership of White Electric LLC, his derivative asylum claim, and his clean criminal record. (*Id.* at ¶ 6). At 4:27 PM counsel for Petitioner "received an email response from Supervisory Detention and Deportation Officer (SDDO) Amber Elmasry, summarily asserting unproven administrative allegations of 'document fraud' regarding employment to deny release." (*Id.* at ¶ 7). Notably, Petitioner "has no criminal charges or convictions for document fraud or any other felony," and his "criminal record consists exclusively of two minor, non-violent traffic citations from December 2025." (*Id.* at ¶ 7).

At 4:58 PM, ERO Assistant Field Office Director ("AFOD") Paul Gray ("Gray") issued a final email denial of release, wherein Gray made the following statement: "[Petitioner] has resided in the United States by your account for more than 1 year and is just now filing for Asylum." (*Id.* at ¶ 8 (quoting Doc. No. 6-2 at 1)). Thereafter, Petitioner filed the "Emergency Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Complaint for Declaratory and Injunctive Relief" (Doc. No. 1 "Petition")—wherein Petitioner "contest[ed] the capricious and unlawful

---

[3] The following facts asserted by Petitioner are, unless somehow qualified herein (as for example by "Petitioner alleges that"), taken as true for purposes of the Motion (though not necessarily for any future purposes in this litigation), because they are either: (1) (a) evidentially supported at least to some degree by Petitioner; and (b) plausible; or (2) subject to judicial notice. The Court notes that it is erring on Petitioner's side when accepting for present purposes that an alleged fact is true merely because it is plausible.

[4] Notably, ERO is one of the operational directorates within U.S. Immigration and Customs Enforcement.

administrative imprisonment of [Petitioner], as well as the immediate, bad-faith efforts by U.S. Immigration and Customs Enforcement ("ICE") to relocate him from this judicial district to a remote Louisiana site." (*Id.* at 1). Via his Petition, Petitioner asserted three claims: (1) "Violation of the Fifth Amendment Due Process Clause & Statutory Right to Counsel (Right to Counsel of Choice and Interference with Pending Administrative Relief)" (Count I) ("Right to Counsel Claim"); (2) "Violation of the Fifth Amendment's Due Process Clause under *Lopez-Campos v. Raycraft*[, 175 F.4th 713 (6th Cir. 2026)] (Unlawful Mandatory Detention of a Long-Term Interior Resident)" (Count II) ("Due Process Claim"); and (3) "Abuse of Discretion and Arbitrary and Capricious Agency Action" (Count III) ("Abuse of Discretion Claim"). (*Id.* at 6-7). The filing of the Petition was followed by the filing of the initial motion for TRO (Doc. No. 2), which was denied—via the Court's June 30 order (Doc. No. 5)—without prejudice due to procedural defects.

On June 30, 2026, the Memphis Immigration Court clerk's office rejected Petitioner's initial bond motion. (Doc. No. 6-6 at ¶ 11). The formal rejection notice (Doc. No. 6-7, "Rejection Notice") stated that the filing was rejected because the court was "UNABLE TO LOCATE IN THE DETAINED LOCATOR DUE TO RESP BEING MINOR." (Doc. No. 6-6 at ¶ 11 (quoting Doc. No. 6-7)). According to counsel for Petitioner, the rejection was a result of two compounding administrative errors: (1) the clerk's office mistakenly categorizing Petitioner as a "minor," and (2) a lag in ICE's Online Detainee Locator.[5] (*Id.*). Counsel for Petitioner immediately—and that same day—refiled the corrected bond package, which clarified Petitioner's correct age, verified Petitioner's physical detention location, and noted that online database lags do not limit the court's jurisdiction. (*Id.* at ¶ 12).

---

[5] More specifically, counsel for Petitioner asserted that "[Petitioner's] public profile at the time displayed 'Call ICE For Details' rather than listing his actual physical facility, despite him being in ERO physical custody since June 29." (Doc. No. 6-6 at ¶ 11(b)).

ICE is currently executing a rapid transit operation to relocate the Petitioner from Tennessee, with the intention of transporting Petitioner overland or via air to a remote contract detention facility in Louisiana. (*Id.* at ¶ 13, Doc. No. 6 at 3). As for Petitioner, he "suffers from severe, chronic medical conditions, specifically Type 2 Diabetes, Hypertension, and High Cholesterol [3]" and "requires strict, uninterrupted daily medication and monitoring." (Doc. No. 6-6 at ¶ 15).

2.      Relief Sought via the Motion and Accompanying Filings

Pending before the Court is Petitioner's Motion (Doc. No. 6). Via the Motion, Petitioner moves for the immediate entry of a TRO enjoining the Respondents, their officers, agents, and all persons acting in active concert or participation with them, from:

1. Transferring, moving, or transporting the Petitioner, Jose Luis Atanacio Ramirez (A-Number: A262-360-276), outside the geographic jurisdiction of the United States District Court for the Middle District of Tennessee or the jurisdiction of the Memphis Immigration Court;

2. Relocating the Petitioner to any facility that disrupts his immediate face-to-face legal access to and communication with his Nashville-based counsel of record, Aaron Dendy, Esq.; and

3. Taking any administrative action that would interfere with, moot, or foreclose his pending Motion for Custody Redetermination currently filed before the Executive Office for Immigration Review ("EOIR"), Memphis Immigration Court.

(*Id.* at 1-2). The Proposed Order requests additionally that the Court order Respondents to show cause as to "why this Court should not enter a Preliminary Injunction." (Doc. No. 6-1 at 5).

LEGAL STANDARD

A "TRO is an extraordinary and drastic remedy . . . ." *Ahrouch v. Boulakhrif*, No. 2:25-CV-02535-SHL-CGC, 2025 WL 1490494, at *2 (W.D. Tenn. May 23, 2025) (quoting *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996)). Those seeking a TRO (or, for

that matter, a preliminary injunction)[6] must meet four requirements.[7] They must show a likelihood

of success on the merits; irreparable harm in the absence of the injunction; the balance of equities

<hr/>

[6] The standards for evaluating a request for both a TRO and a preliminary injunction are the same. *G.S. ex rel. Schwaigert v. Lee*, 558 F. Supp. 3d 601, 607 (W.D. Tenn. 2021). Thus, in addressing Petitioner's request for a TRO, the Court will, at times, invoke case law that addresses requests for preliminary injunctions rather than requests for TROs.

[7] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are factors rather than requirements, except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a TRO alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g., D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent with other (including more recent) Sixth Circuit case law and with Supreme Court cases (including *Winter*) that describe these as all being requirements (i.e., things that *must* be established. *See, e.g., id.* at 328, 329 (Nabaldian, J., concurring) (noting that "[*Winter*]'s language seems clear—a plaintiff *must* establish the factors" and questioning "whether the balancing analysis itself aligns with *Winter*.").

Notably, other courts have likewise treated the four items as requirements (prerequisites), rather than as factors. *E.g., Southern Poverty Law Ctr. V. United States Dep't Homeland Sec.*, No. 18-760 (CKK), 2020 WL 3265533, *10 (D.D.C. June 17, 2020); *Transatlantic, LLC v. Humana, Inc.*, 8:13–CV– 1925–T–17TBM, 2013 WL 3958361, *1 (M.D. Fla. Aug. 1, 2013).

The Court believes that it needs to choose between the two approaches—even if the substance or the outcome of the Motion does not turn on such choice—because the approach does dictate how a court goes about explaining its analysis and decision on a motion for preliminary injunction. And the Court believes that it should follow the latter line of cases, i.e., those that treat the standard as involving requirements rather than factors.

First, explaining and applying the standard in terms of requirements is substantially more straightforward than the alternative—which is to explain that the four items are factors to be balanced, except that, well, that's only partially true because actually irreparable harm *is* a requirement (but also, if it exists, *then* a factor to be balanced along with the other factors) and likelihood of success (at least to some minimal extent) is also required. *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) ("Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (noting that it is reversible error for a district court to issue a preliminary injunction "where there is simply no likelihood of success on the merits (quoting *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010))). Second, it is easier to articulate a conclusion as to whether requirements are satisfied (which is done in simple yes/no, or satisfied/unsatisfied, terms) than to articulate the outcome of some so-called "balancing" of (mismatched) factors. This is especially true given that case-specific balancing apparently is based in part on some inscrutable sliding scale of required likelihood of success on the merits that depends on the strength of the other three factors. *See, e.g., In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985) ("[T]he degree of likelihood of success required may depend on the strength of the other factors.").

The Court notes that herein it quotes some case law that refers to these items as "factors" and describes them in language that befits factors more than requirements—as for example by referring to the issue of *whether* issuing the injunction would harm others (factor-style language) rather than the *requirement* that the balance of equities favors the movant, or the issue of where the public interest lies (factor-style language) rather than the requirement that the public interest favors an injunction. In so doing, the Court is confident that the astute reader readily will be able to translate the factor-style language into the

favors them; and that the public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022).

Those seeking a TRO may not merely rely on unsupported allegations, but rather must come forward with more than "scant evidence" to substantiate their allegations.[8] *See, e.g.*, *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of COVID-19 in prisons); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, *1 n.1 (6th Cir. Jan. 23, 1996) (noting a lack of evidence to support speculative allegations); *Dates v. HSBC*, 721 F. Supp. 3d 616, 624 (S.D. Ohio 2024) (noting that a plaintiff seeking a TRO "may not merely rely on unsupported allegations, but rather must come forward with more than 'scant evidence' to substantiate their allegations." (quoting *Patel v. AR Grp. Tenn., LLC*, No. 3:20-cv-52, 2020 WL 5849346, at *4 (M.D. Tenn. Oct. 1, 2020) (collecting cases))); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, No. 1:06-CV-811, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction].

---

corresponding language of requirements for purposes of following the Court's analysis herein. The Court also notes that even in some opinions where the court clearly treats the four items as requirements, the court therein at times refers to them as "factors." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 677 (N.D. Tex. 2016).

[8] As noted in a footnote above, however, the Court for present purposes (to promote expediency) treats Petitioner as having established certain facts based merely on allegations that are plausible.

Plaintiff's unsupported allegations do not suffice." (citations omitted)). In deciding a motion for a TRO, a court may consider the entire record, including affidavits and other hearsay evidence. *Sterling v. Deutsche Bank Nat'l Tr. Co.,* 368 F. Supp. 3d 723, 725 (S.D. N.Y. 2019); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018).

In conducting the TRO analysis, the Court is not limited to the four corners of the complaint but rather may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding. *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); *Action NC v. Strach*, 216 F. Supp. 3d 597, 629 (M.D.N.C. 2016) (explaining that district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted).

It is often stated that a district court has discretion to grant or deny TROs. *See, e.g., Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). If that is the case, then it follows that the district court has the discretion to grant or deny a TRO even if the movant has shown (by satisfaction of the four requirements) that it is at least *eligible* for a TRO;[9] otherwise, the district court's heralded discretion to deny a TRO would be illusory (indeed non-existent) because the district court would have *no discretion* to deny a TRO to any movant that *is* eligible for one and of course would have *no discretion* to grant a TRO where the movant is *not* eligible for one (i.e., where the requirements are *not* satisfied).

---

[9] It only makes sense for the district court to have such discretion. After all, a TRO is an extraordinary remedy, one with a particular primary purpose (preserving the status quo). It stands to reason that a district court should have discretion in deciding whether—even if it can check the box on each of the four requirements—such an extraordinary remedy is unjustified by the circumstances as a whole and/or would fail to preserve the status quo (and instead would change the status quo).

The Court's conclusion that it has the discretion to deny a TRO even if the movant has shown it is eligible for a TRO is buttressed by caselaw from federal circuit courts (although not as yet the Sixth Circuit), as well as numerous other district courts. *See e.g., RJ's Int'l Trading, LLC v. Crown Castle S., LLC*, No. 23-10453, 2024 WL 1509156, at *2 (11th Cir. Apr. 8, 2024) ("Even in those cases where the requirements of a permanent injunction have been met, a court maintains broad discretion to deny permanent injunctive relief."); *Bethesda Softworks, L.L.C. v. Interplay Ent. Corp.*, 452 F. App'x 351, 353 (4th Cir. 2011) ("'whether to grant the injunction still remains in the 'equitable discretion' of the [district] court' even when a plaintiff has made the requisite showing." (quoting *Christopher Phelps & Assocs., LLC v. Galloway,* 492 F.3d 532, 543 (4th Cir. 2007))); *Franciscan All, Inc. v. Burwell*, 227 F. Supp.3d 660, 677 (N.D. Tex. 2016) (finding that even when the movant satisfies the four preliminary injunction factors, "the decision whether to grant or deny a preliminary injunction remains discretionary with the district court."). *See also Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.").

ANALYSIS

1.     <u>Requirements</u>

As noted above, a party seeking grant of a TRO (or a preliminary injunction) must show: (1) whether the movant has demonstrated a likelihood of success on the merits; (2) whether the movant will suffer irreparable harm in the absence of relief; (3) whether the balance of equities favors the movant; and (4) whether the injunction would serve the public interest. *Winter*, 555 U.S. at 20.

*i. Likelihood of Success on the Merits*[10]

To start, the Court will assess the likelihood of success on the merits of each of Petitioner's three claims.

First, with respect to both Petitioner's Right to Counsel Claim and Abuse of Discretion Claim (i.e., Counts I and III), the Court finds that Petitioner has not sufficiently demonstrated a likelihood of success on the merits. Notably, "[t]he [movant] bears the burden of demonstrating his entitlement to a preliminary injunction, and his burden is a heavy one." *Adams v. Tennessee Dep't of Corr.*, No. 1:15-CV-00115, 2018 WL 896902, at *2 (M.D. Tenn. Jan. 11, 2018), *report and recommendation adopted sub nom. Adams v. Tennessee Dep't of Correction*, No. 1:15-CV-00115, 2018 WL 895330 (M.D. Tenn. Feb. 14, 2018). If a party seeking a TRO is to demonstrate the likelihood of his success on a claim, naturally the party must explain the legal and factual underpinnings of his claim. Petitioner has failed to provide such an explanation as to Petitioner's Right to Counsel Claim and Abuse of Discretion Claim.

As it relates to Petitioner's Abuse of Discretion Claim (i.e., Count III), the Petition devotes just one paragraph to his Abuse of Discretion Claim, and the Court finds that such paragraph does not provide a sufficient legal basis from which the Court could find Petitioner likely to succeed. (Doc. No. 1 at 7). Moreover, the Court discerns that Petitioner is not even attempting to rely on his Abuse of Discretion Claim as grounds for granting the Motion, because Petitioner does not appear to even bring up this claim in the Motion. (*See* Doc. No. 6).

---

[10] In this section, the Court states various facts in an unqualified manner, for ease of reading. But to be clear, these statements are based on the current state of the record and certain assumptions the Court is making for present purposes, are subject to change, and do not reflect the Court's final conclusion as to the applicable facts. Instead, they represent only the Court's view, based solely on the current record and assumptions made *arguendo*, of facts that are *likely* to be established.

Regarding Petitioner's Right to Counsel Claim (i.e., Count I), the Court finds that Petitioner likewise fails to establish a likelihood of success. In his Petition, Petitioner alleges that "ICE is violating [his Fifth Amendment] protections by transferring Petitioner out of this district while he has pending applications for relief and an active bond motion," asserting that "[r]elocating a detainee far from counsel and family severely infringes upon the right to counsel, causing irreparable constitutional injury." (Doc. No. 1 at 6). But notably Petitioner wholly fails to cite any legal support for such assertions, and in the absence of such support, the Court cannot find that Petitioner has sufficiently established a likelihood of success on the Right to Counsel Claim. In support of his Right to Counsel Claim, Petitioner relies on his allegation that the planned transfer of Petitioner (allegedly) violates certain ICE policies governing transfer of certain ICE detainees. (Doc. No. 6 at 5-6). Even if that allegation were true, it would not assist Petitioner in establishing a likelihood of success as to his Right to Counsel Claim; that claim of course was brought in a petition under § 2241, and such a petition can be used to challenge custody as being violative of "the Constitution or laws or treaties of the United States," 28 U.S.C. § 2241(c)(3), as opposed to violative of an agency's mere internal administrative operating procedures.[11]

---

[11] For the sake of clarity, the Court emphasizes that—via his Due Process Claim (Count II)—Petitioner *does* challenge his custody itself (specifically, being in custody without a bond hearing) as violative of the Constitution.

The Court's point above is cabined to Petitioner's argument which attempts to transmute purported violations of ICE policy (i.e., those presented by Petitioner's impending transfer) into violations of Petitioner's Fifth Amendment rights:

> The Petitioner has demonstrated a strong likelihood of success on the merits of his underlying Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241. . . Second, the proposed transfer violates ICE's own binding regulatory mandates. ICE Policy Directive 11022.1, *Detainee Transfers* (Jan. 4, 2012), sets forth clear, self-imposed limitations on the agency's transfer authority. Under Section 5.2 of the Directive, ERO is prohibited from transferring a detainee who has an attorney of record within the sending Area of Responsibility ("AOR"), immediate family within the AOR, or pending bond or removal proceedings within the AOR, unless approved in writing at the AFOD level or higher with documented justifications in the detainee's A-File . . . By executing an expedited

Moreover, when addressing in his Proposed Order the likelihood of his success on the merits, Petitioner focused solely on assertions related to the likelihood of success as to his Due Process Claim (i.e., Count II). (Doc. No. 6-1 at 2). This further showcases Petitioner's failure to show, for purposes of ruling on this Motion, a likelihood of success on the merits on his Right to Counsel Claim and his Abuse of Discretion Claim.

But, for the reasons discussed below, the Court does find that Petitioner has sufficiently demonstrated a likelihood of success on the merits as to his Due Process Claim (i.e., Count II), and notably, "to obtain injunctive relief, [the movant] need only demonstrate a likelihood of success on the merits of *one* of their claims." *Tennessee v. United States Dep't of Educ.*, 615 F. Supp. 3d 807, 837 (E.D. Tenn. 2022) (citing *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 781 (6th Cir. 2003) ("If [the moving party] can show a likelihood of success on the merits of any of the claims, an injunction may issue, subject to consideration of the other factors.")), *aff'd sub nom. State of Tennessee v. Dep't of Educ.*, 104 F.4th 577 (6th Cir. 2024).

Via his Due Process Claim Petitioner asserts that "[u]nder the Sixth Circuit's binding precedent in *Lopez-Campos*, 175 F.4th at 721, [Petitioner's] civil detention is governed exclusively by 8 U.S.C. § 1226(a)," and that he "is constitutionally and statutorily entitled to a localized bond hearing where the government must justify his continued detention." (Doc. No. 6 at 5). Notably,

---

transfer driven by an informal email and without the required written AFOD justifications entered into his A-File, ERO is acting *ultra vires* and in direct violation of its own binding policy.

(Doc. No. 6 at 5-6). But Petitioner does not articulate how his impending transfer, *even if* violative of ICE policies, would also be violative of "the Constitution or laws or treaties of the United States," 28 U.S.C. § 2241(c)(3), and thereby suitable for challenge via a § 2241 petition. Relatedly, Petitioner does not explain why the referenced ICE policies create any substantive rights for him such that he could complain about their denial.

Accordingly, even if his planned transfer would violate ICE policies, that would not assist Petitioner in establishing a likelihood of success as to his Right to Counsel Claim (Count I) or indeed as to either of his other claims.

in *Lopez-Campos*, the Sixth Circuit affirmed multiple district courts' holdings[12] that detentions without bond hearings under 8 U.S.C. § 1225(b)(2)(A) were unlawful and violated due process. 175 F.4th at 732, 734. The court reasoned that 8 U.S.C. § 1225(b)(2)(A)'s mandatory detention scheme, which does not provide for individualized bond hearings, does not apply to people who are not seeking admission or lawful entry into the United States, because they are already in the United States. *See id.* at 732. The court also concluded that detention without a bond hearing of individuals who are already in United States and who have spent a "significant time . . . within the interior of the United States" constitutes a deprivation of liberty in violation of the Due Process Clause. *Id.* at 734.

The record demonstrates that Petitioner was already residing in the United States when he was taken into ICE custody and that he has been residing in the United States for the past eleven (11) years. (Doc. No. 6-6 at ¶¶ 5-6). Therefore, the Court finds that Petitioner clearly falls into the category of individuals contemplated by *Lopez-Campos*, meaning that he has a high likelihood of success on the merits as to his Due Process Claim, whereby he asserts that his detention without a bond hearing constitutes a deprivation of liberty in violation of the Due Process Clause.

Thus, the Court finds that Petitioner is likely to succeed on his Due Process Claim (i.e., Count II).

### ii. Irreparable Harm

Next, the Court must consider whether Petitioner will suffer irreparable injury without the requested TRO. "Rule 65(b) is clear that the possibly drastic consequences of a restraining order mandate careful consideration by a trial court faced with such a request." *Westfield Ins. Co. v.*

---

[12] The undersigned himself held likewise prior to the issuance of *Lopez-Campos. See Cardona v. Ladwig,* No. 25-CV-01451, 2025 WL 3722009, at *7 (M.D. Tenn. Dec. 23, 2025). The Court notes that for some reason, Westlaw has ascribed to the order in *Cardona* an incorrect date (December 3, 2025).

*Pavex Corp.*, No. 17-14042, 2017 WL 6407459, at *1 (E.D. Mich. Dec. 15, 2017). Before a court may issue a TRO, "it should be assured that the movant has produced compelling evidence of irreparable and immediate injury." *Id.*

When asserting that he will suffer irreparable harm without the requested TRO, Petitioner asserts—first and predominantly—that if he is transferred to Louisiana, he will be deprived of his right to a § 1226(a) bond hearing (to which he is allegedly entitled). This is so, according to Petitioner, because contrary to the Sixth Circuit's opinion in *Lopez-Campos*, the Fifth Circuit "has endorsed mandatory, bond-ineligible detention for interior unadmitted residents under *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026)," and "[u]nder the Board of Immigration Appeals' (BIA) January 2026 Nationwide Guidance and *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025), local Louisiana Immigration Judges routinely refuse to conduct federal court-ordered § 1226(a) bond hearings, claiming they lack jurisdiction over unadmitted interior residents." (Doc. No. 6-1 at 3; Doc. No. 6 at 7-8 (asserting that Louisiana Immigration Judges "routinely refuse to conduct federal court-ordered § 1226(a) bond hearings, claiming they lack jurisdiction over unadmitted interior residents under [Fifth Circuit Precedent].")). Put simply, Petitioner's argument is that unless the Court issues an order preventing his transfer to Louisiana, any eventual order of this Court granting Petitioner's underlying Petition and ordering a bond hearing would "be rendered a practical nullity" due to Fifth Circuit precedent and the routine practices of Louisiana Immigration Judges ("IJ"). (*Id.* at 8).

The Court disagrees. If the Petition is meritorious (as the Court has found likely at least as to Count II), then the Court will issue an order (or judgment) that directs Respondents either (1) to promptly release Petitioner outright or (2) either (a) provide Petitioner with a § 1226(a) bond hearing within a specified (short) time period or (b) promptly release Petitioner outright. In either

scenario, Petitioner will either get the desired bond hearing or (even better) be released without even the need for a bond hearing. This is true even if (as Petitioner contends) an IJ in Louisiana would refuse to conduct a § 1226(a) bond hearing ordered by this Court pursuant to option (2)[13] because such an event would result in Respondents being required to release Petitioner. Why? Because any order of the Court would be clear: if for any reason—which would include an IJ in Louisiana refusing to hold a bond hearing—Petitioner does not receive a bond hearing, then Petitioner must be released. In sum, the transfer to Louisiana will not impair his ability to quickly receive a bond hearing or (better still) get released outright, if his Petition proves meritorious. Therefore, this claim of irreparable harm fails.[14]

In further support of his claim that he will suffer irreparable injury absent entry of the requested TRO, Petitioner asserts that the transfer to Louisiana will cause irreparable injury by: (1) permanently derailing his pending, renewed motion (filed in Immigration Court in Tennessee) for a bond redetermination hearing; (2) unconstitutionally burdening the established attorney-client relationship; and (3) imposing risk to Petitioner's physical health. (Doc. No. 6 at 8-9). But none of these alleged irreparable injuries are sufficient, either.

First, although Petitioner asserts that the transfer to Louisiana would permanently derail his pending, renewed motion for bond redetermination hearing, this appears to no longer be a

---

[13] The Court notes that it has serious doubts that a Louisiana IJ would flout an order of this Court directing that a § 1226(a) bond hearing be held.

[14] Petitioner filed a Notice of Supplemental Authority, apparently in further support of his assertion that the transfer would result in irreparable injury. (Doc. No. 10 at 2 (asserting that the Notice of Supplemental Authority "provide[s] absolute, uncontroverted proof of certain, irreparable harm that requires this Court's immediate intervention")). More specifically, the Notice of Supplemental Authority provides both legal authority and factual circumstances that would tend to further support Petitioner's assertion that his transfer to Louisiana would result in any hypothetical bond hearing being held by an IJ in Louisiana in particular. But even assuming *arguendo* that this assertion is correct, that still would not establish that Petitioner would suffer irreparable harm, for the same reasons explained above.

viable claim of irreparable injury in light of Petitioner's Notice of Supplemental Authority, wherein Petitioner seems to admit that Petitioner's renewed motion for bond redetermination hearing was denied. (Doc. No. 10 at 2 ("Today, July 1, 2026, the Memphis Immigration Court clerk's office rejected Petitioner's re-filed Motion for Custody Redetermination **a second time**.") (emphasis original)).  Therefore, this allegation of irreparable injury fails.

Second, the assertion that Petitioner will be irreparably injured by virtue of the unconstitutional burden the transfer would (allegedly) impose on the established attorney-client relationship likewise fails. This claim of irreparable injury would seem most closely tied to Petitioner's Right to Counsel Claim (i.e., Count I)—a claim for which this Court found Petitioner failed to show a likelihood of success (*supra* Section 1.i). But irrespective of which claim(s) this alleged irreparable injury is tied to, the Court nonetheless finds that the record does not sufficiently establish that any such harm would actually be suffered by Petitioner. Notably, the record does not indicate the degree to which communication after the transfer would actually be worse than it is now. This is especially true considering that counsel does not appear to be able to communicate with Petitioner currently. (Doc. No. 6-6 at 1 ("Because of [Petitioner's] sudden detention, his isolation, and ERO Nashville's strict limits on communication during overnight transit, he is physically inaccessible to me.")). Moreover, there is no showing that consultation with Petitioner is necessary to adequately litigate this particular case, considering that it is a case that seems (a) likely to be resolved very promptly, based on the currently prescribed deadlines and the undersigned's history of promptly resolving these kinds of cases, (b) not in need of further factual enhancement; and (c) one likely to be resolved (promptly) based on undisputed facts. To the extent that Petitioner contends that the situation in this regard is different from what the Court perceives, Petitioner has provided nothing to support that contention or otherwise explain why the TRO is

*actually in this case* (as opposed to merely hypothetically or potentially) necessary to prevent irreparable injury in the form of impaired communications caused by a transfer of Petitioner to Louisiana. Therefore, the Court finds that this allegation of irreparable injury also fails.

Finally, the assertion that the transfer would irreparably harm Petitioner by virtue of imposing risk to Petitioner's physical health also fails. For various reasons upon which the Court need not herein expound, the issues raised in support of a motion for a TRO should be related to the merits of the movant's underlying claims. *See, e.g.*, *Suber v. Khune*, No. 2:25-CV-391, 2025 WL 1367216, at *2 (S.D. Ohio May 12, 2025) (recommending denial of a motion for TRO in part because "Plaintiff raises issues in his motion for a TRO/preliminary injunction that are unrelated to the merits of the claim presented in his Complaint."), *report and recommendation adopted*, No. 2:25-CV-391, 2025 WL 1642673 (S.D. Ohio June 10, 2025); *Kinard v. Rubitschun*, No. 05-74131, 2007 WL 2121910, at *2 (E.D. Mich. July 24, 2007) (denying motion for a TRO in part because "[t]he subject matter of Plaintiff's motion for a preliminary injunction is therefore unrelated to his underlying cause of action.").

The Court finds that the health concerns are not sufficiently related to the alleged violations (or for that matter the relief requested) in the Petition. The alleged violations are not based on Petitioner's health status, and Petitioner does not claim entitlement to relief that is based in any way on his health status.

All told, none of Petitioner's asserted irreparable injuries warrant issuance of the requested TRO. Thus, the Court concludes that Petitioner—although showing a likelihood of success on one of his claims—has not satisfied one of the requirements for his requested preliminary injunctive relief: a demonstration that he is likely to suffer irreparable harm absent his requested injunctive

relief. Therefore, the Court will deny the Motion (Doc. No. 6). However, the Court intends to resolve the Petition promptly, in accordance with the current (compressed) schedule.

CONCLUSION

For the reasons stated herein, the Court **DENIES** the Motion (Doc. No. 6).

IT IS SO ORDERED.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE